UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| MICHIGAN MILLERS MUTUAL INSURANCE COMPANY,<br><br>          **Plaintiff,**<br><br>vs.<br><br>DG&G COMPANY, INC.; STAPLE COTTON COOPERATIVE ASSOCIATION; AND BELTWIDE COTTON COOPERATIVE,<br><br>          **Defendants.** | Case number 1:06cv0110 TCM |

## **MEMORANDUM AND ORDER**

This insurance dispute is before the Court[1] on the motion of plaintiff, Michigan Millers Mutual Insurance Company ("Michigan Millers), for summary judgment. [Doc. 36] Defendant DG&G Company ("DG&G") has filed a memorandum in opposition, as have Staple Cotton Cooperative Association and Beltwide Cotton Cooperative (collectively referred to as the "Cooperatives").

## **Background**

The instant action has its genesis in a complaint filed by the Cooperatives against 47 defendants, including DG&G; DG&G's president, Gaylon Lawrence; Federal Compress & Warehouse Company, Inc. ("Federal Compress"); and 44 cotton producers who agreed to deliver their 2005 crop year cotton to one of the Cooperatives. The Cooperatives allege that

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

the 2005 crop year cotton transferred by the producers to the Cooperatives was ginned by DG&G, warehoused by Federal Compress, and, when delivered to the Cooperatives, "did not meet industry standards of merchantability." (DG&G Ex. A. ¶¶ 1-55.) When at the Federal Compress warehouse, the producers were issued negotiable electronic warehouse receipts, which they used to secure loans. (Id. ¶ 53.) When the receipts were delivered to one of the Cooperatives, title to the cotton was to be transferred to that Cooperative. (Id. ¶ 54.) Only after paying for the cotton, did the Cooperatives discover the poor condition of the cotton bales. (Id. ¶ 55; Stat. of Mat. Facts[2] ¶ 26.)

The Cooperatives also allege that DG&G "added excess water during the packing process to the cotton[.]" (Id. ¶ 53.) This excess water rendered the bales unmerchantable. (Id. ¶ 55.) Four of the eighteen counts in the Cooperatives' amended complaint are against DG&G: Count I alleges a cause of action for negligence; Count II for negligent misrepresentation; Count III for tortious interference with contract; and Count XIV for civil conspiracy. In turn, DG&G has filed a cross-claim against Federal Compress and a third-party complaint against nine third-party defendants,[3] including the designers, manufacturers, and distributors of bags used to bag the cotton ginned by DG&G; the designers and manufacturers of equipment used to enhance the moisture content of cotton ginned by DG&G; and the distributor and supplier of a device used to check the moisture content of

---

[2]"Stat. of Mat. Facts" refers to those statements of fact of Michigan Millers that are admitted by the opposing parties.

[3]Two of these defendants have been dismissed for lack of jurisdiction.

cotton after it is baled. (DG&G Ex. F.) It is undisputed that only DG&G personnel had access to the cotton when the cotton was at DG&G. (Stat. Mat. Facts ¶ 29.)

At all times relevant, Michigan Millers had issued two insurance policies to DG&G: a Commercial Agribusiness Policy, No. A010034203, and a Commercial Umbrella Liability Policy, No. 010028003. (Compl. Exs. B & C.) The former includes a Commercial Agribusiness Policy ("the Agribusiness policy II"), a Commercial Auto Policy ("the Commercial Auto policy"), and a General Liability Policy ("the General Liability policy"). (Compl. Ex. B.) The annual premium for the Agribusiness policy II was $124,104.00 and for the General Liability policy was $5,520.00. The Agribusiness policy II does not cover "growing crops," but does cover gin stock, including raw seed cotton and baled cotton "in which [DG&G] has an insurable interest." (Id., Gin Stock Coverage at 1.) It also does not cover loss to that stock caused by wetness or dampness unless directly caused by a peril insured against. (Id. at 3.) And, it extends coverage, under certain circumstances, to spoilage. (Id., Common Policy Conditions at [17].)

The General Liability policy obligates Michigan Millers to "pay those sums that [DG&G] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies" and to "defend the insured against any 'suit' seeking those damages." (Id., Commercial General Liability Form at 1.) The "bodily injury" and "property damage" must have been caused "by an 'occurrence' that takes place in the 'coverage territory.'" (Id.) "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id. at 12.) "'Property

damage' means . . . [p]hysical injury to tangible property . . . ." (Id.) Excluded from coverage is damage to "[p]ersonal property in the care, custody or control of the insured" and property damage to " your product" or "your work" "arising out of it or any part of it[.]" (Id. at 3, 4.) "'Your product' means . . . [a]ny goods or products . . . handled, distributed or disposed of by . . . [y]ou." (Id. at 12.) "'Your work' means . . . [w]ork or operations performed by you or on your behalf . . . ." (Id. at 13.)

The General Liability policy and the Commercial Auto policy are the underlying policies for the Umbrella Liability policy. (Compl. Ex. C, Declarations at 2.) The Agribusiness policy II is not listed as an underlying policy. (Id.) Michigan Millers was obligated under the Umbrella Liability policy to "pay those sums, in excess of the amount payable under the terms of any 'underlying insurance,' that the insured becomes legally obligated to pay as damages because of 'injury' or damage to which this insurance applies, provided that the 'underlying insurance' also applies . . . ." (Compl. Ex. C at 1.) With certain exceptions, the Umbrella Liability policy was "subject to the same terms, conditions, agreements, exclusions and definitions as the 'underlying insurance[.]'" (Id.)

In its motion for summary judgment, Michigan Millers argues that it is not obligated under the General Liability policy or the Umbrella Liability policy to defend DG&G in the Cooperatives' suit or to indemnify it because (a) the complained-of damage occurred when the cotton was in the care, custody, and control of DG&G and (b) there was no property damage as that term is interpreted in Missouri. In response, DG&G contends that summary

judgment is inappropriate because there is a genuine dispute as to when and how the cotton was damaged. In their separately-filed response, the Cooperatives make a similar argument.

## Discussion

Standard of Review of Summary Judgment Motions. "Rule 56(c) [of the Federal Rules of Civil Procedure] 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" **Erenberg v. Methodist Hosp.**, 357 F.3d 787, 791 (8th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)) (alteration added). An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." **Hartnagel v. Norman**, 953 F.2d 394, 395 (8th Cir. 1992) (citations omitted).

The initial burden is on the moving party to clearly establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. See **City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.**, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. See **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574, 586 (1986). Where the unresolved issues are primarily legal, rather than factual, summary judgment is particularly appropriate. See **Adams v. Boy Scouts of America -**

**Chickasaw Council**, 271 F.3d 769, 775 (8th Cir. 2001); **Gordon v. City of Kansas City, Mo.**, 241 F.3d 997, 1002 (8th Cir. 2001).

Duty to Defend. Missouri law is applicable, see **J.E. Jones Const. Co. v. Chubb & Sons, Inc.**, 486 F.3d 337, 340 (8th Cir. 2007); **Capitol Indemn. Corp. v. 1405 Assocs., Inc.**, 340 F.3d 547, 549 (8th Cir. 2003); and holds that an insurance policy is a contract and is governed by the rules of contract construction, see **Leonards v. Southern Farm Bureau Cas. Ins. Co.**, 279 F.3d 611, 613 (8th Cir. 2002); **Blair v. Perry County Mut. Ins. Co.**, 118 S.W.3d 605, 606 (Mo. 2003) (en banc).

Under Missouri law, "'[t]he duty to defend is broader than the duty to indemnify[,]'" **Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.**, 401 F.3d 876, 879 (8th Cir. 2005) (quoting McCormack Baron Mgmt. Servs., Inc. v. Am. Guarantee & Liability Ins. Co., 989 S.W.2d 168, 170 (Mo. 1999) (en banc)) (alterations added), and exists "where there is a potential liability," **id.** "There is a duty to defend allegations within the policy's coverage even if the insurer may not ultimately be obligated to indemnify the insured." **Valentine-Radford, Inc. v. American Motorists Ins. Co.**, 990 S.W.2d 47, 51 (Mo. Ct. App. 1999). "In assessing whether there is a duty to defend, [the Court] must compare 'the language of the policy with the allegations in the petition.'" **Universal Underwriters Ins. Co.**, 401 F.3d at 879 (quoting Auto Club Family Ins. Co. v. Jacobsen, 19 S.W.3d 178, 182 (Mo. Ct. App. 2000)) (alteration added). See also **McCormack Baron**, 989 S.W.2d at 170-71 ("If the complaint merely alleges facts that give rise to a claim potentially within the policy's

coverage, the insurer has a duty to defend."); **Royal Ins. Co. of America v. Kirksville College of Osteopathic Medicine**, 191 F.3d 959, 961 (8th Cir. 1999) (citing McCormack Baron).  In doing this comparison, the Court "must give each term its ordinary, lay meaning unless the policy expressly defines a term in a technical manner." **Universal Underwriters**, 401 F.3d at 880 (citing Farmland Inds. Inc. v. Republic Ins. Co., 941 S.W.2d 505, 508 (Mo. 1997) (en banc)).  If the policy does clearly define a term, the policy definition controls. **Heringer v. American Family Mut. Ins. Co.**, 140 S.W.3d 100, 103 (Mo. Ct. App. 2004). If, however, "the language of the policy is ambiguous, it is construed against the insurer." **Id.** at 102-03.  "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of words used in the contract." **Id.** at 103.  An ambiguity does not exist merely because "the parties disagree over the interpretation of a contract." **Missouri Employers Mut. Ins. Co. v. Nichols**, 149 S.W.3d 617, 625 (Mo. Ct. App. 2004). Additionally, when considering whether a duty to defend exists, "actual facts known or ascertainable at the commencement of the suit may also be considered." **Superior Equip. Co. v. Maryland Cas. Co.**, 986 S.W.2d 477, 482 (Mo. Ct. App. 1998).

DG&G notes that "[t]here has been no determination of how the damage to the cotton . . . was caused."  (DG&G Mem. at 5.)  This observation is correct, but irrelevant.  If DG&G is found liable it is because the Cooperatives prove, at a minimum, that excess water found its way into the cotton when it was at DG&G.  In such circumstances, "the fact of loss determines primarily the amount of damages as distinguished from liability for damages.

The liability for which such damages are awarded may be attributable to many factors." **Harry Winston, Inc. v. Travelers Indem. Co.**, 366 F.Supp. 988, 990-91 (E.D. Mo. 1973). In the instant case, there is a genuine dispute when and how the damage to the cotton occurred, e.g., if it occurred after it left DG&G or if it occurred because of malfunctioning equipment designed to accurately measure the moisture content of baled cotton. "The exclusionary provisions of the [General Liability policy] are concerned with [DG&G's] liability; with the act that makes [it] liable for damages because of the loss." **Id.** at 991 (alterations added). See also **J.E. Jones Const. Co.**, 486 F.3d at 340 (issue of whether incident at issue actually occurred was irrelevant to dispositive question of whether insurance policies covered incident, if it had indeed occurred).

The question then is whether the exclusionary provisions of the General Liability policy apply to the allegations in the Cooperatives' complaint against DG&G.

"'[T]he insurer has the burden of proving that an insurance policy exclusion applies.'" **Am. Econ. Ins. Co. v. Jackson**, 476 F.3d 620, 623 (8th Cir. 2007) (quoting Am. Family Mut. Ins. Co. v. Co Fat Lee, 439 F.3d 436, 439 (8th Cir. 2006)) (alteration in original). "An exclusion relied upon to deny coverage must be clear and free from doubt." **Id.** (interim quotations omitted). Moreover, under Missouri law, "where an insured risk and an excluded risk constitute concurrent proximate causes of an accident, a liability insurer is liable so long as one of the causes is covered by policy." **Capitol Indem. Corp. v. Haverfield**, 218 F.3d 872, 875 (8th Cir. 2000).

The policy at issue excludes damage to personal property in DG&G's "care, custody or control." "[T]he care, custody or control provision has been consistently found to be unambiguous by the courts of [Missouri]." **Opies Milk Haulers, Inc. v. Twin City Fire Ins. Co.**, 755 S.W.2d 300, 302 (Mo. Ct. App. 1988) (alterations added). This provision refers to the "possessory handling of the property as distinguished from proprietary control." **Id.** at 303. Possessory handling, or physical control, "involves an exercise of dominion over the property." **Estrin Const. Co. v. Aetna Cas. and Sur. Co.**, 612 S.W.2d 413, 429 (Mo. Ct. App. 1981). "In each case the characteristic of the property determines the nature of the dominion and control possible." **Id.** Additionally, the control may be exercised by the insured or by its agents and employees. See **Kirchner v. Hartford Acc. & Indem. Co.**, 440 S.W.2d 751, 755 (Mo. Ct. App. 1969). See also **Valentine-Radford, Inc.**, 990 S.W.2d at 54 (noting that "when property is in the possession of an employee of the corporate named insured, it is also in the possession of that corporate named insured").

*Any* liability of DG&G to the Cooperatives is clearly based on their allegation that excess water found its way into the cotton bales when the cotton was at DG&G. Cotton is a chattel, i.e., it is moveable personal property, see Black's Law Dictionary 236 (6th ed. 1990), which, under the allegations in the instant case, was under the dominion and control of DG&G and its agents and employees when at DG&G.

In **Opies Milk Haulers, Inc.**, cited by Michigan Millers, the damage at issue occurred when fructose was loaded into a contaminated tanker. 755 S.W.2d at 302. The court held

that there could be no dispute that when loaded into the tanker, the fructose was in the care, custody or control of the insured. **Id.** at 303. Similarly, *if* DG&G is liable to the Cooperatives, it is because the cotton was damaged when it was in DG&G's care, custody, or control. "[T]he decisive factor is control of the [cotton] at the time of the act which ma[kes] [DG&G] liable for its loss . . . ." **Harry Winston, Inc.**, 366 F.Supp. at 991 (alterations added). If the cotton was damaged after it left the warehouse, DG&G is not liable. If the cotton was damaged when at DG&G but because of malfunctioning equipment, that does not affect Michigan Millers' duty to defend DG&G against the claims by the Cooperatives for the damaged cotton.

Because any liability of DG&G to the Cooperatives would be based on acts or omissions when the cotton was in DG&G's care, custody, or control, that exclusionary provision in the General Liability policy applies.

Michigan Millers further argues that it has no duty to defend because there is no "property damage" caused by an "occurrence" as required by the General Liability policy. DG&G and the Cooperatives disagree.

"Where an insurance policy defines an 'occurrence' as meaning an accident,' [as does the General Liability policy], the term 'accident' is given its common meaning:

> An event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event. Hence, often an undesigned and unforeseen occurrence of an afflictive or unfortunate character; a mishap resulting in injury to a person or damage to a thing; a casualty; . . . ."

**J. E. Jones Const. Co.**, 486 F.3d at 341 (quoting Hawkeye-Security Ins. Co. v. Davis, 6 S.W.3d 419, 425 (Mo. Ct. App. 1999)). "Missouri courts have held that negligent acts may qualify as 'occurrences.'" **Id.** See also **Valentine-Radford, Inc.**, 990 S.W.2d at 52 (negligence claim qualified as "occurrence"). At this stage in the underlying suit filed by the Cooperatives, there is a genuine issue of material fact as to whether any excess moisture in the cotton when at DG&G was the result of an occurrence.

In support of its argument that the loss at issue is not the type of damage contemplated by the phrase "property damage," Michigan Millers cites **R. W. Murray Co. v. Shatterproof Glass Corp.**, 697 F.2d 818, 829 n.11 (8th Cir. 1983). The Eighth Circuit held in that case that a general diminution in the value of a building caused by a manufacturer supplying defective glass panels was "economic loss" and not "property damage" as required by the insurance policy. The court has more recently held that, under Missouri law, "[t]he plain meaning of 'property damage' under [insurance policies with identical language to the one at issue] is a tangible, that is, a physical or material, loss or destruction of property." **St. Paul Fire & Marine Ins. Co. v. Lippincott**, 287 F.3d 703, 705 (8th Cir. 2002) (alterations added).

In **Scottsdale Ins. Co. v. Ratliff**, 927 S.W.2d 531, 533 (Mo. Ct. App. 1996), the Missouri Court of Appeals held that a claim by homeowners that a negligent inspection which failed to discover termite damage and which resulted in the homeowners purchasing a house with a diminished value alleged property damage as that term was used in the

inspector's insurance policy. The court noted that "[i]t could be found that the pleaded diminution in value was the result of physical damage, either leaving the property in a less desirable state or requiring expenditures for repair. By the ordinary meaning of words there is 'property damage,' and the policy definition is not at variance with the ordinary meaning." **Id.** at 534 (alteration added). Thus, the insurer had a duty to defend its insured.

The Eighth Circuit found a duty to defend in **Ferrell v. West Bend Mut. Ins. Co.**, 393 F.3d 786 (8th Cir. 2005), a case involving claims by tomato growers that plastic film meant to prevent blight on tomatoes had instead caused early blight, less fruit, and smaller tomatoes. The tomato growers had successfully sued the film manufacturer for breach of implied warranties of merchantability and fitness, and the issue then before the court was whether the manufacturer's commercial general liability insurance provider had a duty to indemnify its insured. The insurance policy had an identical definition of "property damage" and "occurrence" to the policy now at issue. The court rejected the insurer's argument that the damages were economic losses, not property damage. **Id.** at 794. The court found that the tomato plants were damaged by the film and concluded "[t]hat the damages at trial were measured in terms of lost profits or diminished gross receipts does not change the fact that property was damaged." **Id.** at 795. The court applied Wisconsin law when interpreting the insurance policy; however, that law is consistent with the law of other states interpreting similar provisions. See **Nat. Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc.**, 346 F.3d 1160, 1165 (8th Cir. 2003) (citing cases from five other jurisdictions that found claims

for damages resulting from contaminated agricultural products were claims for "property damage" as that term was defined in insurance policies); **Triple U Enters., Inc. v. New Hampshire Ins. Co.**, 766 F.2d 1278, 1280 (8th Cir. 1985) (finding that damage to calves born to a diseased buffalo sold by insured was "property damage" under South Dakota law).

In **R. W. Murray Co.**, 697 S.W.2d at 829, cited by Michigan Millers, the complained-of damage was the diminished value of a building caused by the supplying of defective panels. In the instant case, the complained-of damage is to property, i.e., cotton. The question of how to measure that damage is separate from the question whether it is "property damage."

In another case cited by Michigan Millers, **Ludwig Candy Co. v. Iowa Nat'l Mut. Ins. Co.**, 396 N.E.2d 1329 (Ill. Ct. App. 1979), the court held that an insurer had no duty to defend an insured from claims by a marketer that a plastic tray used by the insurer to package its candy products had impregnated that candy with a "plastic taste." In the underlying action, the marketer alleged that it had suffered a loss of profits, damage to its reputation, and loss of goodwill as a result of the insured's use of the plastic trays. **Id.** at 1330. Noting that the defective candy product was withdrawn from the market before any injury to tangible property resulted, the court held that the damages alleged by the marketer were solely economic losses and were not property damage as required under the insurance policy. **Id.** at 1332. In so holding, the court distinguished the case before it from another case alleging that a buyer of defective valves was forced to scrap its hair spray products because of the

valves. **Id.** In that case, "damage to tangible property was the gist of the action against the insured." **Id.**

In the instant case, it is damage to tangible property, i.e., cotton, that is the gist of the Cooperatives' action against DG&G and the other defendants. Although the damage at issue is "property damage," any liability of DG&G for that damage is, as noted above, for acts or omissions when the cotton was in DG&G's care, custody, or control. Thus, the provision in the General Liability policy excluding coverage for damage to personal property that was in DG&G's care, custody, or control applies and relieves Michigan Millers of the duty to defend under that policy.

<u>Duty to Indemnify and Umbrella Liability Policy.</u> "The duty to indemnify turns on whether the claim is *actually* covered by the Policy," whereas the duty to defend "turns on whether the claim is *potentially* covered by the Policy." **American Econ. Ins. Co.**, 476 F.3d at 624. Because the Court has found that Michigan Millers has no duty under the exclusionary "care, custody or control" provision in its General Liability policy to defend DG&G in the Cooperatives' action, it finds that it has no duty to indemnify DG&Gt under that policy. Moreover, because Michigan Millers' duties under the Umbrella Liability Policy depend on coverage under the General Liability policy, it has also no duty under the umbrella policy.

**Conclusion**

Michigan Millers has no duty to defend or indemnify DG&G under either the General Liability policy or the Umbrella Liability policy from claims asserted against DG&G by the Cooperatives in the case styled <u>Staple Cotton Coop. Ass'n v. D.G.and G., Inc.</u>, 1:06cv0046 TCM.

The question remains, however, whether Michigan Millers has a duty to either defend or indemnify DG&G under that portion of its Commercial Agribusiness Policy that is, confusingly, also called a Commercial Agribusiness Policy. Although Michigan Millers states in its reply brief that its complaint is "only directed to general liability coverage," the Agribusiness policy II is attached to the complaint and the prayer for the complaint refers simply to "Michigan Millers Policies." Consequently, although Michigan Millers' motion for summary judgment will be granted as to the General Liability policy and the Umbrella Liability policy, this action remains pending. Accordingly,

**IT IS HEREBY ORDERED** that the motion of Michigan Millers Mutual Insurance Company for summary judgment is **GRANTED** in part and **DENIED** in part as set forth above. [Doc. 36]

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this <u>23rd</u> day of October, 2007.