**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **MICHIGAN MILLERS MUTUAL** | ) | |
| **INSURANCE COMPANY**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-cv-00110-TCM |
| | ) | |
| **D G & G COMPANY, INC., STAPLE** | ) | |
| **COTTON COOPERATIVE ASSOCIATION**, | ) | |
| and **BELTWIDE COTTON COOPERATIVE**, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S**
**SECOND MOTION FOR SUMMARY JUDGMENT**

Defendant D. G. & G. Company, Inc. ("DG&G") offers the following Memorandum in

Opposition to Plaintiff Michigan Millers Mutual Insurance Company's ("Michigan Millers")

Second Motion for Summary Judgment:

**I. Response to Uncontradicted Statement of Material Facts**

A.      **The Parties and Jurisdiction**

1.      **DG&G admits the facts contained in Paragraph One (1).**

2.      **DG&G denies the facts contained in Paragraph Two (2). DG&G's gin, gin office**

and principal place of business is located in Stoddard County, Missouri.  *See* **Exhibit 1,**

**Affidavit of Leila Dodson.**

3.      **DG&G admits the facts contained in Paragraph Three (3).**

4.      **DG&G admits the facts contained in Paragraph Four (4).**

5.      **DG&G admits the facts contained in Paragraph Five (5).**

6.      **DG&G admits the facts contained in Paragraph Six (6).**

7.      DG&G admits the facts contained in Paragraph Seven (7).

8.      DG&G admits the facts contained in Paragraph Eight (8).

**B.      The Underlying Lawsuit/Claims**

9.      DG&G admits the facts contained in Paragraph Nine (9).

10.     Denied.  The entire *Staplcotn* lawsuit has not fully settled as of this time as claims are still pending against several third-party defendants. *See* Exhibits 2 and 3, Stipulations of Dismissal.

11.     Admitted in part and denied in part.  DG&G admits that Michigan Millers has quoted a portion of its response to Interrogatory #23.  DG&G states that Michigan Millers does not quote the entire response.  *See* Exhibit 4, DG&G's Response to Interrogatory #23.

12.     DG&G admits the facts contained in Paragraph Twelve (12).

13.     DG&G denies the facts contained in Paragraph Thirteen (13).  DG&G admits that the farmers/producers, or their agents, obtained loans from the Commodity Credit Corporation ("CCC") on the cotton at issue.  However, the loans were marketing loans and not crop production loans.  *See* Exhibit 1, Affidavit of Leila Dodson.

14.     In regard to the facts contained in Paragraph Fourteen (14), DG&G admits that the CCC loans were collateralized by the cotton; however, at the time the loans were made, it was baled cotton.  *See* Exhibit 1, Affidavit of Leila Dodson.

15.     DG&G admits the facts contained in Paragraph Fifteen (15).

16.     DG&G admits the facts contained in Paragraph Sixteen (16).

17.     DG&G admits the facts contained in Paragraph Seventeen (17).

18.     In Paragraph Eighteen (18), Michigan Millers contends that the plaintiffs in the underlying lawsuit alleged that "DG&G improperly ginned the cotton in the Fall of 2005

resulting in excess water content and their ultimately claimed financial losses relating to the unmerchantable, defective cotton." DG&G admits that the underlying suit makes allegations that the cotton was improperly ginned, resulting in excess water content, causing the cotton to be unmerchantable, stating that DG&G "plac[ed] excess water in the bales; or us[ed] polyethylene bags to wrap the cotton after placing excess water in the bales."*See* **Michigan Millers' Exhibit D, ¶ 55, 58.  DG&G does not admit, and denies, that the plaintiffs in the underlying suit sought to recover for only financial losses.  The underlying complaint seeks damages in general.** *See* **Michigan Millers' Exhibit D, ¶¶ 59, 67, 71.  The damages alleged are broad enough to include "property damage" due to the moldy, water packed, and physically degraded cotton.** *See id.*

19.     Denied.  DG&G disputes that the damages in the *StapleCotn* Lawsuit were the result of defects in the Cotton which would not have rendered the Cotton unmerchantable but for excessive moisture added to the cotton during the ginning process.  There has been no determination that excessive moisture was added to the cotton.  Furthermore, there has been testimony in the underlying case that an appropriate amount of water was added to the cotton, but was concentrated in parts of the bales instead of being evenly distributed. *See* **Exhibit 5, Deposition of Gene Lewis, p. 205-210.  Reports produced by the Vomax machine indicate that the bales did not contain excess water.** *See* **Exhibit 6, Affidavit of Tim Woods.  Also, DG&G's water usage was very similar during the 2004 and 2005 ginning seasons, when DG&G ginned similar amounts of cotton, and, in 2004, received no significant reports of wet cotton.** *See id.*

20.     DG&G denies the allegations contained in Paragraph Twenty (20) as it is without information as to the facts, events, actions, or occurrences, the knowledge of which Michigan Millers imputes to the Cooperatives in this paragraph. DG&G admits, however, that

the Cooperatives responded in the affirmative to a request for admission seeking to establish the aforementioned facts.

21.    DG&G admits the facts contained in Paragraph Twenty-One (21).

22.    DG&G admits the facts contained in Paragraph Twenty-Two (22).

23.    DG&G denies the facts contained in Paragraph Twenty-Three (23).  The damage to the cotton occurred while that cotton was stored at Federal Compress facilities, as the cotton was "pretty white and clean" when it arrived at the warehouse, and only later began to show mold, hardness and deterioration. *See* Exhibit 7, Deposition of Robert Reed, page 30, line 11 through page 31, line 9, page 61, lines 17-19; *see* Exhibit 8, Deposition of Doug Darnell, page 42, lines 20-23; page 97, lines 3-20.

24.    DG&G denies the facts contained in Paragraph Twenty-four (24).  DG&G admits that Michigan Millers has accurately quoted a portion of its response to an interrogatory request.  However, DG&G employees only had access to the cotton while it was located at DG&G's gin.  DG&G has no knowledge of who may have had access to the cotton after it left DG&G's premises. *See* Exhibit 4, DG&G's Response to Michigan Millers' Interrogatory #25.

25.    DG&G admits the facts contained in Paragraph Twenty-Five (25).

26.    DG&G admits the facts contained in Paragraph Twenty-Six (26).

27.    DG&G admits the facts contained in Paragraph Twenty-seven (27), provided that DG&G relied upon the advice and recommendation of its equipment vendors, as well as the accuracy and proper functioning of the Lewis system and Vomax devices during the ginning process. *See* Exhibit 9, DG&G's response to Michigan Millers' Request for Admission #10.

28.     DG&G admits the facts contained in Paragraph Twenty-Eight (28), provided that DG&G relied upon the advice and recommendation of its equipment vendors.

29.     DG&G admits the facts contained in Paragraph Twenty-Nine (29).

30.     DG&G admits the facts contained in Paragraph Thirty (30), noting that DG&G's investigation into the matter is continuing.

31.     DG&G admits that Michigan Millers has accurately quoted portions of the expert report of Russell M. Marhefka.

32.     DG&G admits that Michigan Millers has accurately quoted portions of the expert report of Roy E. Childers, P.E.

33.     DG&G admits that Michigan Millers has accurately quoted portions of the expert report of Louis F. Bouse, P.E.

34.     DG&G admits that Michigan Millers has accurately quoted portions of the expert report of Robert J. Collins, Jr.

35.     DG&G admits that Michigan Millers has accurately quoted portions of the expert report of J. Alex Thomasson.

36.     DG&G admits that Michigan Millers has accurately quoted portions of the expert report of Gary Huitink.

37.     DG&G admits the facts contained in Paragraph Thirty-Seven (37).

38.     DG&G admits the facts contained in Paragraph Thirty-Eight (38).

39.     DG&G admits the facts contained in Paragraph Thirty-Nine (39).

40.     DG&G admits the facts contained in Paragraph Forty (40).

41.     DG&G admits the facts contained in Paragraph Forty-One (41).

42.     DG&G admits the facts contained in Paragraph Forty-Two (42).

43.     DG&G admits that it first contacted Michigan Millers with notice of the claims against it on January 23, 2006.  DG&G denies the remaining facts contained in Paragraph Forty-Three (43) and states that Michigan Millers' failure to respond within the admittedly narrow time constraints imposed by the changing of the Adjusted World Price, and the impending declaration of default on the producers' CCC loans by the USDA, had the practical effect of denying DG&G's claim. *See* Exhibit 6, Affidavit of Tim Woods.

44.     DG&G admits the facts contained in Paragraph Forty-Four (44).

45.     DG&G admits the facts contained in Paragraph Forty-Five (45).

46.     DG&G admits that Michigan Millers stated in several letters that it was continuing to investigate the matter. *See* Michigan Millers Exhibit R.

47.     DG&G admits the facts contained in Paragraph Forty-Seven (47).

48.     DG&G admits that Michigan Millers has quoted portions of the policy language.

49.     DG&G admits that Michigan Millers has quoted portions of the policy language.

50.     DG&G admits that Michigan Millers has quoted portions of the policy language.

51.     DG&G admits that Michigan Millers has quoted portions of the policy language.

52.     DG&G admits that Michigan Millers has quoted portions of the policy language.

53.     DG&G admits that Michigan Millers has quoted portions of the policy language.

54.     DG&G admits that Michigan Millers has quoted portions of the policy language.

55.     DG&G admits the facts contained in Paragraph Fifty-Five (55).

## II. Additional Uncontradicted Material Facts

56.     The Commercial Agribusiness Policy provides the following exclusion for Contamination or Deterioration:

> d.      Contamination or Deterioration - - "We" do not pay for loss
> caused by contamination or deterioration, including bin burn,
> corrosion, decay, fungus, mildew, mold, rot, rust; change in grade

> or condition; organic heating of grain, seed, or other agricultural
> product; or any quality, fault, or weakness in covered property
> that causes it to damage or destroy itself.
>
> "We" do cover any resulting loss caused by a "specified peril" or
> breakage of building glass.

*See* Exhibit B to Michigan Millers Complaint for Declaratory Judgment, Commercial

Agribusiness Policy Form AG 0100 01 01, p. 26 of 46.

57.    "Specified Perils" are defined under the Commercial Agribusiness Policy as

follows:

> "Specified Perils" means aircraft; explosion; falling objects; fire;
> hail; leakage from fire extinguishing equipment; lightning; riot;
> "sinkhole collapse"; smoke; sonic boom; vandalism; vehicles;
> "volcanic action"; water damage; weight of ice, snow, or sleet;
> and windstorm.
>
> Falling Objects does not include loss to:
>
> a.    personal property or stock in the open; or
>
> b.    the interior of buildings or structures or to personal
> property or stock inside buildings or structures, unless the
> exterior of the roof or walls are first damaged by a falling
> object.
>
> Water damage means the sudden or accidental discharge or
> leakage of water or steam as a direct result of breaking or
> cracking of a part of the system or appliance containing the water
> or steam.

*See* Exhibit B to Michigan Millers Complaint for Declaratory Judgment, Commercial

Agribusiness Policy Form AG 0100 01 01, p. 4 of 46.

58.    StapleCotton Cooperative, one of the plaintiffs in the underlying suit, learned

that the Commodity Credit Corporation (CCC) was in the process of calling the loans on bales

of cotton ginned at DG&G's gin in the 2005 ginning season due to water content. *See* Exhibit 10, Deposition of Woods Eastland, pp. 72-74, 82. StapleCotton then redeemed all of its bales of cotton ginned at DG&G's gin in 2005 prior to the CCC calling the loans. *Id*. at 74-77. Part of StapleCotton's motivation for redeeming the loans was to take advantage of the storage fees and marketing loan gains which would be lost if the bales were not redeemed prior to the loans being called. *Id.* at 88-89.

59. Beltwide Cotton Cooperative, one of the plaintiffs in the underlying lawsuit, learned through a contact at the CCC that DG&G cotton allegedly contained excessive moisture and would be ineligible for the federal loan program. *See* Exhibit 11, Deposition of Mike Farrish, p. 173. Beltwide took action to redeem its cotton from DG&G prior to the cotton being found to be ineligible for the loan program. *Id.* at 172.

60. DG&G did not fully become aware of the extent of the damage to the cotton from the 2005 ginning season until January 2006. *See* Exhibit 6, Affidavit of Tim Woods.

61. In January 2006, DG&G was contacted by several different entities including Federal Compress, the Farm Services Administration and marketing agents that had purchased some of the cotton ginned at DG&G's gin. These entities informed DG&G of the moisture issues with the cotton and the fact that it was beginning to mold, discolor and harden while in storage at Federal Compress' warehouses. *See* Exhibit 6, Affidavit of Tim Woods.

62. The Fifty Thousand (50,000) bales ginned at DG&G's gin were pledged as collateral for loans made to the producers of the cotton by the Commodity Credit Corporation, a branch of the Farm Services Administration which is, in turn a branch of the U.S. Department of Agriculture. *See* Exhibit 6, Affidavit of Tim Woods.

63. When the Commodity Credit Corporation learned in January 2006 of the issues relating to the cotton ginned at DG&G's gin, it decided to declare the cotton to be unfit

collateral and to call the loans on all of the cotton ginned at DG&G's gin which had not yet been redeemed. *See* Exhibit 6, Affidavit of Tim Woods.

64.    "Redeeming" cotton means that someone has paid to the Commodity Credit Corporation the amounts remaining on the loans on the bailed cotton. This frees the cotton from liens and allows it to be sold or transferred to others. The cotton loans were in the names of all of the individual producers of the cotton. If the loans had been called and the individual producers of the cotton had been unable to pay off the loans immediately, those individual producers would have been prohibited from future participation in all federal farm programs, putting them out of business. *See* Exhibit 6, Affidavit of Tim Woods.

65.    DG&G became aware in January 2006 that the producers' loans were going to be called by the FSA. DG&G was also aware that the producers would likely have damages claims against DG&G as a result. Furthermore, if those producers defaulted on their loans, were unable to participate in future loan programs and were therefore forced out of business, the damages claims against DG&G would certainly increase. *See* Exhibit 6, Affidavit of Tim Woods.

66.    In January 2006, DG&G received demands from Cargill Cotton Company, Brunson & Company, Inc. and Dunavant Enterprise, Inc. all of whom had purchased cotton that had been ginned at DG&G's gin. These cotton merchants had some cotton which had been redeemed and some which had not. These companies would not allow DG&G to purchase the cotton which those companies had not yet redeemed unless DG&G also purchased the cotton they had already redeemed. These companies asserted claims against DG&G for damaged cotton. DG&G communicated these demands by letter to Michigan Millers on January 25, 2006. *See* Exhibit 6, Affidavit of Tim Woods.

67.     Further complicating the situation was the fact that the cost of redeeming the loans was about to increase.  The redemption price for the loans was based on the adjusted world price of cotton.  The adjusted world price of cotton was set to change at the close of business on January 26, 2006.  Experts familiar with the cotton industry predicted that the price of cotton would increase, thereby increasing the amount it would cost to redeem the cotton from the federal loans.  Accordingly, DG&G had only a few days to determine whether to redeem the cotton. *See* Exhibit 6, Affidavit of Tim Woods.

68.     In addition, if the loans would have been called by the CCC, the producers would have most likely lost the benefit of the Loan Deficiency Payments which amounted to several hundred thousand dollars. *See* Exhibit 6, Affidavit of Tim Woods.

69.     When the cost of dealing with the problem became known, DG&G submitted its demand to Michigan Millers asking the insurance carrier to assume responsibility for paying off the CCC loans and buying out the interests of the cotton brokers.  In reply, Michigan Millers in a letter dated January 25, 2006, stated that it needed to further investigate the matter and would not accept responsibility for dealing with the situation. Accordingly, DG&G took the initiative to limit the scope of the problem and paid out its own funds to resolve the claims of the cotton merchants.  *See* Exhibit 6, Affidavit of Tim Woods.

70.     Due to the shift in the price of cotton and the impending declaration of default on the CCC producer loans, DG&G made the business decision to redeem all of the cotton and to settle the claims held by Cargill, Brunson & Company and Dunavant Enterprises.  These transactions involved purchasing the merchants' interests in the cotton and paying off the producer loans at the Commodity Credit Corporation. The total expenditure in January 2006 by DG&G was $6,354,173.48. *See* Exhibit 6, Affidavit of Tim Woods.

71.     DG&G immediately began sending the cotton it had redeemed and purchased to Memphis, Tennessee to be reconditioned and sold for whatever could be gained out of the reconditioned cotton.  The reconditioning ultimately generated $2,780,208.73, for a net loss from the cotton purchased from the cotton brokers including Cargill, Brunson & Company, and Dunavant Enterprises of $3,573,964.75.  *See* Exhibit 6, Affidavit of Tim Woods.

72.     DG&G did not settle the claims of Staple Cotton and Beltwide in 2006 and those entities ultimately filed the underlying suit against DG&G, Federal Compress and the producers. Michigan Millers continuously denied coverage, although it initially defended DG&G in the suit.  Michigan Millers ultimately revoked its defense of DG&G in the underlying case. Thereafter, DG&G settled the additional claims of Beltwide and StapleCotton.  DG&G settled all claims of StapleCotton for $1,750,000.00 and all claims of Beltwide for $750,000.00.  DG&G also received a total of $100,000.00 in settlement on its claims against Federal Compress & Warehouse Company, Inc., L.P. Brown Co., Inc., LoneStar Plastics, Inc., and Wade King d/b/a King Packaging. Michigan Millers had the opportunity to assume responsibilities for these claims of Staple Cotton and Beltwide and chose not to. *See* Exhibit 6, Affidavit of Tim Woods.

73.     Considering both the amounts paid in 2006 and the amounts paid in 2007 to settle the claims of Staple Cotton and Beltwide, DG&G has paid a net amount of $5,983,964.75 to settle all claims relating to the cotton ginned at DG&G's gin during the 2005 ginning season. *See* Exhibit 6, Affidavit of Tim Woods.

74.     There has been no determination as to how the damaging water entered into the cotton or what it was about the water that caused the damage to the cotton.  The Vomax reports showed that excess water was not added to the cotton bales.  Additionally, water usage

records from DG&G from the 2004 and 2005 ginning seasons show little variation, and there were no significant reports of wet cotton from the 2004 season.  *See* Exhibit 6, Affidavit of Tim Woods.

_____75.     Fred Bouse, an expert witness hired by DG&G to investigate the water damage to the cotton, studied and tested the Lewis Moisture Machine used in DG&G's gin since 2001. The Lewis Moisture System is a system which contains water.  He found a broken solenoid valve which allowed water to leak  onto the center of the lint slide.  This would result in higher concentration of water on the cotton passing through the center of the lint slide, leading to portions of the bale with greater moisture content than others.  These moisture pockets caused or contributed to the water damage to the cotton bales. *See* Exhibit 12, Affidavit of Fred Bouse.

### III. Argument

Summary judgment is inappropriate in this case. Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must review "all facts in the light most favorable to the party opposing the summary judgment and give the non-moving party the benefit all favorable inferences drawn from the pleadings and affidavits." *Bettin v. Nelson*, 744 F.2d 53, 57 (8th Cir. 1984).  Where an insured risk and an excluded risk constitute concurrent causes of an accident, the insurer is liable so long as one of the causes is covered. *See Bowan ex rel. Bowan v. General Sec. Indemn. Co. of Ariz.*, 174 S.W.3d 1, 5 (Mo.App. E.D. 2005). Michigan Millers is not entitled to judgment as a matter of law as there are numerous issues of material fact which are not only in dispute, but have yet to be determined as of this time.

### A.  Gin Stock Coverage

DG&G will concede that the water damage suffered by the cotton at issue, or the likely causes thereof, are not covered perils under the Gin Stock Coverage form.  However, the Commercial Agribusiness Policy provides coverage where the Gin Stock Coverage Form does not.

### B.  Commercial Agribusiness Policy

Michigan Millers presents only two reasons why coverage is excluded under the Agribusiness Policy's Property and Income Coverage Part.  It contends that the "Defects, Errors, and Omissions" exclusion and the "Contamination or Deterioration" exclusion apply, precluding coverage.  Neither exclusion, however, applies on the facts as presented by Michigan Millers.  At the very least, there are genuine issue of material fact on these issues.

### i.  "Defects, Errors, and Omissions"

Michigan Millers' first contention relates to the "Defects, Errors, and Omissions" exclusion.  The policy states that it excludes losses resulting from:

> 1.  An act, error, or omission (negligent or not) relating to:
>> (b) the design, specification, construction, workmanship, installation, or maintenance of property.
>
> In addition, "we" do not pay for loss to personal property or stock caused by deficiencies or defects in design, development, specifications, materials, manufacturing, mixing, processing, testing, workmanship, or caused by latent or inherent defects.

See Michigan Millers Statement of Uncontroverted Material Facts ("MMSMF"), ¶ 52. Michigan Millers contends that the parties agree that the water damage was caused by the factors listed above.  However, Michigan Millers fails to present evidence to support this contention.

Michigan Millers' policy language is ambiguous.  It first states that losses resulting from "the design, specification, construction, workmanship, installation, or maintenance of property" are excluded.  "Property" is not defined in this policy.  When a term is not defined in an insurance policy, it should be given its common or usual meaning, or the meaning the policyholder would give it. *Camden v. State Farm Mutual Auto Ins. Co.*, 66 S.W.3d 78, 81 (Mo.App. E.D. 2001).  It is unclear, from the exclusion, what damages are excluded.  Without a definition of "property," it is ambiguous whether damages to the cotton or damages to the ginning equipment are excluded.  The dictionary definition of "property" as would be applied by the insured is "something owned." *See The Miriam Webster Dictionary* (1994).  Under this definition, the policy is ambiguous, as there has been no claim that the cotton was not properly designed, specified, constructed, installed or maintained.  Ambiguous language in an insurance policy is construed against the insurer. *Strader v. Progressive Ins.*, 230 S.W.3d 621, 624 (Mo.App. S.D. 2007).

Furthermore, the remaining portion of the exclusion raised by Michigan Millers is also ambiguous.  It states that damages to personal property or stock are excluded when "caused by deficiencies or defects in design, development, specifications, materials, manufacturing, mixing, processing, testing, workmanship, or caused by latent or inherent defects."  Once again, there has been no claim that the cotton was deficient in design, development, specification, materials, manufacturing, mixing, testing, or caused by latent or inherent defects.  Michigan Millers claims that DG&G's "faulty workmanship, or processing" is the only cause of the water damage.  Neither "workmanship" nor "processing" are defined under the policy.  As such, "processing" means "a series of actions or operations directed toward a particular result." *See The Miriam Webster Dictionary*, definition of "process" (1994).  There

is no certain evidence that the damage was a result of a defect in "processing" the cotton. "Workmanship" is defined as "the art or skill of a workman." *See The Miriam Webster Dictionary* (1994). There is certainly the possibility that the damages to the cotton were caused by a breakage of equipment, not due to malfunction or defect. In such case, breakage of equipment would not be a part of the "art or skill of a workman," and would not be excluded. Additionally, there is no evidence that the "only" cause of water damage to the cotton was a result of "faulty workmanship, or processing."

Michigan Millers relies upon interrogatory answers from DG&G to support its contention that the water damage was caused by defective or poorly designed equipment. However, the specific interrogatory responses relied on never state that the only cause of the water damage was due to defective or poorly designed equipment. *See* MMSMF ¶ 30. The interrogatory response merely gives some possible, though no certain, causes of the water damage to the cotton and states clearly that "There has been no determination of how the damage to the cotton, or any device or other item which may have contributed to any damage, was caused." *See id.*

Michigan Millers then presents portions of the reports prepared by DG&G's and its own expert witnesses expressing opinions on the cause of the water damage. *See* MMSMF ¶¶ 31-36. None of these reports, however, can be considered by this Court in its ruling on this motion for summary judgment. FRCP Rule 56(e) provides that affidavits, setting forth facts which would be admissible in evidence, should be submitted in support of a motion for summary judgment. Though DG&G has not been able to locate an Eighth Circuit opinion on this issue, many of the other Circuits have found that an unauthenticated or unverified expert report may not be considered on summary judgment. *See Carr v. Tatangelo*, 338 F.3d 1259,

1273 n. 26 (11th Cir. 2003); *Provident Life and Accident Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001); *Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003); *Fowle v. C&C Cola, a Div. of ITT-Continental Baking Co.*, 868 F.2d 59, 67 & n. 4 (3rd Cir. 1989).

This Court should adopt the rule followed by the above circuits and disregard all unsworn expert reports presented as evidence in Michigan Millers' motion for summary judgment. Accordingly, the only evidence supporting Michigan Millers assertion that a mechanical defect or poor design caused the water damage is DG&G's own speculation as to possible causes of the water damage, beginning with the statement that "There has been no determination of how the damage to the cotton, or any device or other item which may have contributed to any damage, was caused." *See* Michigan Millers USMF ¶ 30. This Court, in ruling on this motion, must view the facts in the light most favorable to DG&G, and this requires the Court to deny Michigan Millers motion for summary judgment.

Further evidence of a genuine dispute of material fact is the affidavit of Fred Bouse, an expert witness hired by DG&G to investigate the water damage to the cotton. Mr. Bouse studied and tested the Lewis Moisture Machine used in DG&G's gin since 2001. *See* DG&G's Additional Statement of Material Facts ("ASMF") ¶ 75. The Lewis Moisture System is a system which contains water. *Id.* He found a broken solenoid valve which allowed water to leak onto the center of the lint slide. *Id.* This would result in higher concentration of water on the cotton passing through the center of the lint slide, leading to portions of the bale with greater moisture content than others. *Id.* These moisture pockets caused or contributed to the water damage to the cotton bales. *Id.* Michigan Millers' own expert offers no opinion regarding mechanical failures or breakage. *See* MMSMF ¶ 36.

The first case cited by Michigan Millers, *Bloom v. Western National Mut. Ins.*, 2006 WL 1806415 (Minn. Ct. App. 2006), is not on point. In that case, the court had before it expert

opinion that the mold was caused by defects in workmanship and design. *Id.* at *3. There is no such expert opinion before the court in this case. The second case cited by Michigan Millers, *Bell Power Systems, Inc. v. Hartford Fire Ins. Co.*, 1995 WL 81430 (Conn. Super. 1995), is also not exactly on point. The facts of the case are quite different, in that it deals with oil leakage from an underground storage tank. *Id.* at *2. Further, the case dealt with a similar policy exclusion in only slight detail and that exclusion was not the only basis for the court's finding of no coverage. *Id.* at *2-5.

Michigan Millers is under a burden to prove the applicability of its policy exclusion. *See State Farm Auto Ins. Co. v. Stockley*, 168 S.W.3d 598, 600 (Mo.App. E.D. 2005). It has not presented evidence that the damage to the cotton was caused solely by an excluded risk. Based on the evidence presented, and when viewing that evidence in the light most favorable to DG&G, the Court must deny summary judgment.

### ii. "Contamination or Deterioration"

The second argument raised by Michigan Millers is that coverage is excluded under the contamination or deterioration exclusion. That exclusion states:

> d. Contamination or Deterioration - - "We" do not pay for loss caused by contamination or deterioration, including bin burn, corrosion, decay, fungus, mildew, mold, rot, rust; change in grade or condition; organic heating of grain, seed, or other agricultural product; or any quality, fault, or weakness in covered property that causes it to damage or destroy itself.
>
> "We" do cover any resulting loss caused by a "specified peril" or breakage of  building glass.

*See* MMSMF ¶ 53; *see also* ASMF ¶ 56. A specified peril is defined as:

> "Specified Perils" means aircraft; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; "sinkhole

collapse"; smoke; sonic boom; vandalism; vehicles; "volcanic action"; water damage; weight of ice, snow, or sleet; and windstorm.

\* \* \* \* \* \* \* \*

_____ **Water damage means the sudden or accidental discharge or leakage of water or steam as a direct result of breaking or cracking of a part of the system or appliance containing the water or steam.**

*See* ASMF ¶ 57. Michigan Millers contends that because the cotton was damaged due to mold, mildew, and deterioration, coverage is excluded.

This exclusion, on its face, provides coverage for a resulting loss from a "specified peril." *See* ASMF ¶ 56. The definition of "specified peril" includes "water damage." *See* ASMF ¶ 57. It is undisputed in this case that the damage to the cotton was a result of water damage. Furthermore, there has been no factual determination as to why or how the damaging water entered into the cotton or what it was about the water that caused the damage, i.e. excess water, unevenly distributed water, or a combination of both. It is certainly plausible, however, that there was a "leakage of water" directly resulting from a "breaking" of a valve or water line in the Lewis Moisture System. It cannot be disputed that the Lewis Moisture System was a system containing water. *See* ASMF ¶ 75. In such an instance, the contamination or deterioration exclusion would not apply to the mold, mildew, and deterioration suffered by the cotton. The affidavit of Fred Bouse, as described above, clearly states that the broken solenoid valves in the Lewis Moisture System caused or contributed to the water damage to the cotton. *See Id.* This, at minimum, creates a factual dispute precluding summary judgment.

It is possible that some combination of "breaking" equipment and defective equipment led to the damage to the cotton. As stated above, though, where an insured risk and an excluded risk constitute concurrent causes of an accident, the insurer is liable so long as one

of the causes is covered. *See Bowan ex rel. Bowan*, 174 S.W.3d at 5.  Though the policy at issue

is not a liability policy, the same reasoning applies where one alleged proximate cause is

arguably excluded, while another cause is covered.  Here, the damage to the cotton is covered

by the policy.

The Court must view the facts in the light most favorable to DG&G, meaning that the

cause of the damaging water in the cotton is unknown.  In such circumstances, the Court must

deny Michigan Millers' Motion for Summary Judgment and proceed with the case.

### iii.  "Volunteer Payments"

Michigan Millers' next argument relates to the "Volunteer Payments" provision in the

Commercial Agribusiness Policy.  Michigan Millers contends that, because DG&G paid the

claims of the settling parties on January 26, 2006, and redeemed a substantial portion of the

bales of cotton at issue on that date, DG&G violated the volunteer payments provision.

Michigan Millers, however, has not given a full description of the situation in January of 2006

regarding the cotton bales.  Furthermore, even if DG&G violated this provision, it would only

apply to monies paid prior to Michigan Millers denial of coverage.[1]

In January of 2006, DG&G began to learn the extent of the problems with the cotton

bales from the 2005 ginning season. *See* ASMF ¶ 60.  DG&G was contacted by several different

entities, including the Farm Services Administration, regarding the moisture content of the

cotton bales. *See* ASMF ¶ 61.  All of the Fifty Thousand (50,000) bales of cotton involved in

this lawsuit were pledged as collateral to loans made to the producers of the cotton by the

---

[1]DG&G has filed a motion to amend its counterclaims to properly state the damages
alleged as the claims of the plaintiffs in the underlying case have been settled following
Michigan Millers' withdrawal of its defense of DG&G.

Commodity Credit Corporation, a division of the U.S. Department of Agriculture. *See* ASMF ¶ 62.

Some of the bales had been redeemed out of loan by late January 2006, while others had not. *See* ASMF ¶ 66. When the Commodity Credit Corporation and the Farm Services Administration learned of the problems with the cotton bales, the government decided to call the loans on the cotton, finding that it was unfit collateral. *See* ASMF ¶ 63. This required the individual cotton producers to repay their loans immediately. *See* ASMF ¶ 64. If the producers had defaulted on these loans, those producers would then have been prohibited from participating in the federal crop loan program in the future. *Id.* This would have caused catastrophic damage to the individual producers and dramatically increased the amount of damages for which DG&G could be held responsible. *See* ASMF ¶ 65.

In order to prevent this from occurring, all of the affected bales which had not yet been redeemed by another entity had to be redeemed by DG&G or its insurer. Further complicating matters, the amount required to redeem the cotton was about to adjust in late January 2006. *See* ASMF ¶ 67. The cost of redeeming cotton from the CCC loan program is based, in part, on the Adjusted World Price ("AWP") of cotton. *Id.* The AWP was set to adjust following the close of business on January 26, 2006. *Id.* Experts at the time predicted that the AWP would adjust upward, leading to a greater redemption cost, and therefore greater damages to the producers. *Id.* Furthermore, if the loans had not been redeemed, the producers would have lost the benefit of Loan Deficiency Payments made by the CCC to the producers, which amounted in this case to several hundred thousand dollars. *See* ASMF ¶ 68.

DG&G explained all of these facts in letters to Michigan Millers on January 23 & 25, 2006. In its letter dated January 25, 2006, DG&G informed Michigan Millers that it would cost $3,419,428.34 to satisfy the claims of the CCC. *See.* MMSMF ¶ 44. Failing to do so would

drastically increase the damages. *See* ASMF ¶¶ 64-68. Michigan Millers, by letter dated January 25, 2006, stated that it was continuing its investigation into DG&G's claim, and, did not have enough information to respond to DG&G's demand for immediate payment of $3,419,482.14. *See* ASMF ¶ 69.  DG&G then took the initiative to limit the scope of the problem and paid out its own funds to resolve the claims of the cotton merchants. *Id.*

On January 26, 2006, DG&G paid a total of $3,419,482.14 to the CCC to redeem all of the cotton which had not yet been redeemed. *See* MMSMF ¶ 40. In order to accomplish this, DG&G had to settle the claims of Dunvant Enterprises, Inc., by purchasing all of its DG&G cotton for $1,127,690.51; of Cargill Cotton for $177,035.64; of Brunson & Company, Inc. for $329,478.91. *See* MMSMF ¶ 36.  By settling these claims, DG&G was able to acquire the necessary interest in the cotton to enable it to redeem  the loans. *See* ASMF ¶ 70. DG&G expended a total of $6,354,173.48, to purchase cotton redeemed by the Settling Parties and redeem cotton which those parties had not yet redeemed as those parties refused to sell the cotton which had not yet been redeemed unless DG&G bought the redeemed cotton as well. *Id.*  DG&G immediately sent this cotton to be reconditioned and sold, generating $2,780,208.73. *See* ASMF ¶ 71.

In addition to the amounts paid in 2006, the balance of DG&G's claim has now become more clear due to the settlement of the claims of the plaintiffs in the underlying suit.  Upon Michigan Millers' denial of DG&G's claims and the revocation of its defense, DG&G settled all claims against it with the plaintiffs in the underlying suit, StapleCotton and Beltwide, for $1,750,000.00 and $750,000.00 respectively. *See* ASMF ¶ 72. DG&G also settled its third-party claims against Federal Compress & Warehouse Company, Inc., L.P. Brown Co., Inc., Lonestar Plastics, Inc., and Wade King d/b/a King Packaging, for a total of $100,000.00.  *Id.*  Michigan Millers had the opportunity to assume responsibility for these claims of Staple Cotton and

Beltwide and chose not to. *See* ASMF ¶ 72.  As of this date and counting all of the cotton, DG&G has expended $5,983,964.75 to settle all claims against it in this case. *See* ASMF ¶ 73.

As further evidence of DG&G's rational behavior, DG&G took exactly the same steps as Staple Cotton and Beltwide upon notice that the loans would be called.  When Staple Cotton and Beltwide learned that the Department of Agriculture was about to call the loans on the cotton, those entities evaluated the situation and determined that the only rational course of action was to redeem the cotton they had purchased in order to save the storage fees and other benefits provided by the federal government. *See* ASMF ¶¶ 58-59.

Admittedly, DG&G gave little time to Michigan Millers to respond to its demand in January 2006.  However, DG&G had little or no time itself.  DG&G provided Michigan Millers with as much notice as DG&G itself was provided.  If DG&G had failed to act as it did, the claims against it would have been substantially greater.  It further would have caused irreparable harm to the individual producers, thereby leading to even greater damages. DG&G acted in a commercially reasonable manner when it settled the claims.  Had DG&G failed to settle the claims, Michigan Millers would likely now be complaining that DG&G did not act to minimize the damages against it in a commercially reasonable manner.  In addition, Michigan Millers cannot complain about the recent payments to Staple Cotton and Beltwide as they were made after the case had been in litigation for one and one-half years and after Michigan Millers had denied coverage and revoked its defense.

Though not recognized in Missouri, California courts have found that a no-voluntary payments provision of an insurance policy may be avoided due to economic necessity. *Low v. Golden Eagle Ins. Co.*, 2 Cal.Rptr.3d 761, 770 (Cal. Ct. App. 2003).  As demonstrated by the uncontradicted material facts, DG&G had no economic choice but to settle some of the claims.

It would be unjust to void coverage for these payments, which would have saved Michigan Millers considerable expense, simply because those payments were made without the consent of Michigan Millers.  There is no claim that DG&G failed to notify Michigan Millers as soon as it realized there was a problem with the cotton and there is no claim that DG&G could have acted at a later time and achieved the same result as to the damages asserted by the settling parties.

Michigan Millers' failure to pay the demand within the time frame set by DG&G operated as a refusal of the claims as of that date.  If an insurer wrongfully denies coverage, it cannot claim the benefit of an exclusion for voluntary settlement by the insured. *Community Title Co. v. Safeco Ins. of America*, 795 S.W.2d 453, 461 (Mo.App. E.D. 1990).  DG&G was under a duty to mitigate damages, and had DG&G failed to pay the claims as it did, and then were Michigan Millers to be adjudicated not liable for the claims, DG&G would be held accountable for needless excess damages.

### III.  Counterclaims

Michigan Millers also seeks the dismissal of DG&G's counterclaims filed in this action. In support of this claim, Michigan Millers asserts that the Court's granting of Michigan Millers' first Motion for Summary Judgment has the practical effect of eliminating DG&G's counterclaims.  In the Court's Memorandum and Order, it determined that Michigan Millers had no duty to defend or indemnify DG&G under the General Liability Policy or the Umbrella Policy issued by Michigan Millers in the underlying suit.

DG&G brought breach of contract claims and vexatious refusal to pay claims against Michigan Millers in this action and has recently filed a motion to amend those counterclaims to assert the proper amount of damages incurred by DG&G.  The Court should not dismiss

the counterclaims.

DG&G contends, as in its response to Michigan Millers first motion for summary judgment, that Michigan Millers has a duty to both defend and indemnify DG&G for the damages it has suffered as a result of the underlying suit. However, to the extent the Court is not willing to reconsider its previous ruling, DG&G concedes that its claims based on the general liability policy form and the umbrella coverage form are no longer viable.

As described above, though, Michigan Millers is not entitled to summary judgment on the Commercial Agribusiness coverage form. None of the exclusions cited by Michigan Millers operate to exclude coverage under this form. As such, DG&G's claim for breach of contract is still viable in that Michigan Millers continues to deny coverage for the property damage suffered by DG&G. Furthermore, as the discussion regarding all of the insurance policies has shown, the damages are not excluded under any policy exclusion or defense raised by Michigan Millers.

As this court cannot dismiss DG&G's counterclaim for breach of contract at this time, it would also be premature to dismiss the vexatious refusal to pay counterclaim. Michigan Millers has been kept fully aware of the progress of the underlying suit, yet has steadfastly refused to pay any claims. Additionally, a motion to dismiss is judged on the pleadings. *Macauley v. Fed. Ins. Co.*, 500 F.3d 784, 787 (8th Cir. 2007). The Federal Rules of Civil Procedure provide for notice pleading which "should be construed to do substantial justice." F.R.C.P. 8(f); *Shurgard Storage Centers v. Lipton-U. City, L.L.C.*, 394 F.3d 1041, 1046 (8th Cir. 2005). This Court must treat all facts as alleged in the DG&G's pleading as true. *Macauley*, 500 F.3d at 787. As such, DG&G has pled that Michigan Millers' denial of the claim was unreasonable and without just cause or excuse, thereby providing notice to Michigan Millers

of DG&G's claim for vexatious refusal to pay.

Accordingly, DG&G's counterclaims should not be dismissed.

### IV.  Conclusion

For the reasons stated above, the Court must deny Plaintiff's Second Summary Judgment Motion.

Respectfully submitted,

BLANTON, RICE, SIDWELL, NICKELL, COZEAN & COLLINS, LLC

By:    /s/

Joseph C. Blanton, Jr.     Fed. Bar No. 2644
Thomas W. Collins, III     Fed. Bar No. 82440
Shaun D. Hanschen          Fed. Bar No. 507433
219 South Kingshighway
Post Office Box 805
Sikeston, Missouri   63801
PHONE (573) 471-1000       FAX (573) 471-1012

*Attorney for the Defendant DG&G*

**<u>Certificate of Service</u>**

I hereby certify that a true and accurate copy of the above and foregoing document was forwarded by the electronic mail system of the United States District on this 23rd day of January, 2008, to the following:

Amy B. Schwent
Williams Venker & Sanders LLC
10 South Broadway, Ste 1600
St. Louis MO  63102

John W. Grimm
Limbaugh, Russell, Payne & Howard
2027 Broadway
PO Box 1150
Cape Girardeau MO  63702-1150

Jennifer Bergstrom
Mark Douglas Paulson
CLAUSEN MILLER PC
10 South LaSalle Street
Chicago, IL  60603-1098

John W. McQuiston II
EVANS & PETREE
1000 Ridgeway Loop Road, Suite 200
Memphis TN  38120


    /s/                           
Joseph C. Blanton, Jr